UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

\* \* \*

|  |  |  |
|---|---|---|
| TAI-SI KIM and JIN-SUNG HONG, | ) | |
| Plaintiffs, | ) | 2:09-CV-02008-PMP-PAL |
| v. | ) | |
| ADAM B. KEARNEY, et al., | ) | ORDER |
| Defendants. | ) | |

Presently before the Court is Defendant Cumorah Credit Union's ("Cumorah") Motion for Summary Judgment (Doc. #159), filed on August 15, 2011.  Plaintiffs filed an Opposition (Doc. #177) on September 8, 2011.   Defendant Cumorah filed a Reply (Doc. #186) on September 26, 2011.  Defendant Valley Foreclosure Services ("VFS") filed a Joinder (Doc. #182) on September 15, 2011.  Plaintiffs filed an Opposition (Doc. #192) to VFS's Joinder on September 29, 2011.

Also before the Court is Plaintiffs' Motion to Extend the Amend Pleading Deadline and Leave to File a Second Amended Complaint (Doc. #163), filed on August 30, 2011.  Defendant Cumorah filed an Opposition (Doc. #175) on September 7, 2011. Plaintiffs filed a Reply (Doc. #180) on September 14, 2011.

Also before the Court is Plaintiffs' Emergency Motion to Suspend Dispositive Motion Deadline (Doc. #165), filed on August 30, 2011.  Defendant Cumorah filed an Opposition (Doc. #173) on September 7, 2011.

Also before the Court is Defendants RE/MAX Extreme, Edward C. Reed, and Barbara P. Reed's (collectively "Reed Defendants") Motion for Partial Summary Judgment on Negligent Undertaking to Perform Services (Doc. #167), filed on September 1, 2011. Plaintiffs filed an Opposition (Doc. #187) on September 26, 2011. Reed Defendants filed a Reply (Doc. #196) on October 13, 2011.

Also before the Court is Reed Defendants' Motion for Partial Summary Judgment on Civil Conspiracy, Concert of Action, Aiding and Abetting (Doc. #168), filed on September 1, 2011. Plaintiffs filed an Opposition (Doc. #188) on September 26, 2011. Reed Defendants filed a Reply (Doc. #195) on October 13, 2011.

Also before the Court is Reed Defendants' Motion for Partial Summary Judgment on Contract Related Claims (Doc. #169), filed on September 1, 2011. Plaintiffs filed an Opposition (Doc. #189) on September 26, 2011. Reed Defendants filed a Reply (Doc. #193) on October 13, 2011.

Also before the Court is Reed Defendants' Motion for Partial Summary Judgment on Plaintiffs' Fraud-Based Claims (Doc. #170), filed on September 1, 2011. Plaintiffs filed an Opposition (Doc. #190) on September 26, 2011. Defendants filed a Reply (Doc. #194) on October 13, 2011.

Also before the Court is Plaintiffs' Motion for Relief From Voluntary Dismissal of Adam B. Kearney (Doc. #179), filed on September 9, 2011. No opposition was filed.

Finally before the Court is Plaintiffs' Motion for Clarification (Doc. #197), filed on October 26, 2011. Defendant VFS filed an Opposition (Doc. #198) on October 26, 2011. Defendant Cumorah filed a Joinder (Doc. #199) to VFS's Opposition on November 1, 2011. Plaintiffs filed a Reply (Doc. #200) to VFS's Opposition on November 8, 2011. Plaintiffs filed a Reply (Doc. #201) to Cumorah's Joinder on November 9, 2011.

///
///

# I. BACKGROUND

Plaintiff Jin-Sung Hong ("Hong") is the son of Plaintiff Tai-Si Kim ("Kim"). (Decl. of Jonathan Salls (Doc. #191) ["Salls Decl."], Ex. 4 at 14.)  Prior to the transaction at issue in this case, Plaintiffs had used the services of Defendants Edward Reed ("Ed"), Barbara Reed ("Barbara"), and their company, Barbie Ltd. doing business as RE/MAX Extreme, to purchase several properties in Nevada.  (Cumorah Credit Union's Mot. for Summ. J. (Doc. #159) ["CMSJ"], Ex. A at 23, 26-27.)  Barbara was a broker-salesperson, and Ed was a real estate licensee for RE/MAX Extreme.  (Reed Defs.' Mot for Partial Summ. J. on Pls.' Fraud-Based Claims (Doc. #170) ["Reed Fraud MSJ"], Exs. A, B.)  Ed and Barbara own RE/MAX Extreme.  (Pls.' Mot. to Amend (Doc. #163), Ex. 1 at 119.)

Ed introduced Plaintiffs to an investment opportunity in a parcel of undeveloped land, Assessor's Parcel Number ("APN") 177-19-801-008 (the "801 Property").  (Salls Decl., Ex. 6 at 129.)  According to Hong, Ed told him the property was worth $800,000, that this was a good deal, and that Plaintiffs should buy the property immediately.  (Salls Decl., Ex. 6 at 129, Ex. 7 at 32.)  Hong entered into a Purchase Agreement with the seller of the 801 Property in June 2005 and put down a refundable $10,000 deposit.  (Reed Fraud MSJ, Ex. C.)  Pursuant to the Purchase Agreement and related counteroffers, Hong was to provide over $90,000 in cash at closing, and finance the remainder for a total purchase price of $435,000.  (Reed Fraud MSJ, Exs. C, D, E.)  Escrow was set to close by July 27, 2005. (Reed Fraud MSJ, Ex. E.)

Although Hong was pre-approved for a loan, the underwriter later refused to underwrite the loan due to a zoning issue.  (CMSJ, Ex. A at 70; Reed Fraud MSJ, Ex. B; Salls Decl., Ex. 3 at 203, Ex. 5 at 136, 147.)  Hong and the seller agreed to extend the time in which Hong could obtain funds to buy the land to August 12, 2005, and in exchange Hong released the $10,000 deposit to the seller.  (Reed Fraud MSJ, Ex. H.)

///

Because Hong could not obtain conventional financing in time to buy the land under the Purchase Agreement's escrow date, Ed referred Hong to Defendant Adam B. Kearney ("Kearney") to assist in obtaining financing. (Salls Decl., Ex. 4 at 14.) Kearney had an agreement with Ed and Barbara pursuant to which Kearney's company, ABK LLC, placed representatives in the RE/MAX Extreme office to accommodate sales, placed business cards and fliers in the RE/MAX Extreme office, and had access to any open houses or other events. (Salls Decl., Ex. 3 at 165-66, Ex. 4 at 30, 32.) In return, Kearney initially paid rent on the office space, and then later paid a per transaction fee for referrals. (Salls Decl., Ex. 3 at 175-76.) Kearney estimated RE/MAX Extreme received a fee of around $7,000 to $10,000 per month from this arrangement. (Salls Decl., Ex. 4 at 29.) Kearney had two representatives in the RE/MAX Extreme offices for approximately two years. (Salls Decl., Ex. 3 at 167.) Although the parties did not have an exclusive relationship, Ed and Barbara sent a substantial portion of their referrals to Kearney. (Salls Decl., Ex. 3 at 167-68, Ex. 4 at 30.)

Hong and Kearney agreed to an arrangement whereby Kearney would purchase the property in Kearney's own name and give Hong the option to purchase the property. (Pls.' Mot. to Amend, Ex. 1 at 208.) When Ed heard of this plan, he advised Hong to get an attorney to protect Hong's interest in the transaction. (Id.) Hong asked if Ed knew an attorney, Ed said he did, and together they called proposed defendant Richard Tobler ("Tobler") of the law office of Richard L. Tobler, Ltd. ("RLT"). (Id.) Tobler agreed to draft an agreement. (Id. at 209.) According to Ed, Tobler stated on the phone to Ed and Hong that Tobler represented Ed and Barbara, not Ed and Barbara's clients. (Id.)

Tobler drafted the Option Agreement. (CMSJ, Ex. G, Attach. 1.) Tobler faxed the agreement to Ed with a cover sheet which indicated that Tobler prepared the draft agreement "with the understanding that RE/MAX is my client as an accommodation to the transaction. You must impress upon Mr. Hong that I do not represent him and that he seek

the advice of his counsel before executing this document." (Id.)

Pursuant to the Option Agreement, Kearney would obtain financing and purchase the 801 Property in his own name, and Hong would have the option to purchase the 801 Property from Kearney within one year. (CMSJ, Ex. D.) Hong agreed to allow Kearney to step into his shoes under the Purchase Agreement, including receiving the benefit of the $10,000 deposit. (Id.) Hong agreed to provide the balance of the down payment, pay all the buyer's closing costs, and make monthly installment payments to the bank on the loan Kearney would obtain to finance the property. (Id.) Upon Hong exercising the option, Kearney would receive a $10,000 payment and Kearney and Hong would open escrow with Defendant First American Title Company ("FATCO"), through which Kearney was to convey the property to Hong with clear and marketable title in exchange for a payoff of the remaining balance owed on the loan. (Id.)

The Option Agreement stated that Kearney was "solely a facilitator for Hong to acquire the Property, and the Exercise Fee is the sole consideration KEARNEY is to receive for acting as the facilitator to Hong acquiring the Property by means of this Option." (Id.) The Option Agreement stated that it was prepared by Tobler as an "accommodation through Hong's broker, and the parties acknowledge that RLT does not represent any party to this transaction." (Id.) The Option Agreement advised the parties to seek independent counsel and that "neither party is relying on the fact that RLT represents their interests in any aspect of this transaction." (Id.) Kearney and Hong executed the Option Agreement on August 10, 2005. (Id.)

Hong and the seller of the 801 Property entered into an Addendum to the Purchase Agreement pursuant to which Kearney was substituted for Hong as the buyer. (CMSJ, Ex. G, Attach. 6.) Separate and apart from the Option Agreement, Plaintiffs borrowed $100,000 at ten percent interest from Kearney to pay the earnest money due at closing. (CMSJ, Ex. E.) Plaintiffs contend they were unaware of any other charges

1    associated with this loan, but Kearney charged them $7,000 as a flat fee.  (Id.)  A Note

2    Secured by Second Deed of Trust (the "Note") dated August 12, 2005 purports to provide

3    that Hong will pay $107,000 plus interest at a rate of ten percent to Frank Napoli ("Napoli")

4    and ABK LLC on or before September 12, 2005.  (First Am. Compl. (Doc. #29), Ex. 7.)

5    Plaintiffs deny that the signature on the Note is Hong's genuine signature.  (CMSJ, Ex. E;

6    Reed Fraud MSJ, Ex. I.)  However, in answers to interrogatories in this action, Plaintiffs

7    indicated that on August 12, 2005, Kearney and Napoli purchased a Note for $100,000 in

8    exchange for $7,000 and ten percent interest to assist Plaintiffs in acquiring the 801

9    Property.  (Reed Fraud MSJ, Ex. S at 18-19.)  Ed and Barbara deny any participation in

10   purchasing or selling the Note if it is genuine, or in forging the Note if it is not genuine.

11   (Reed Fraud MSJ, Exs. A, B.)

12           In addition to the $100,000, Kearney requested Plaintiffs pay him $17,384.

13   (CMSJ, Ex. E; Salls Decl., Ex. 3 at 246.)  According to Kearney, he asked Plaintiffs for

14   these funds to pay RE/MAX Extreme's commission on the sale of the 801 Property.  (Salls

15   Decl., Ex. 4 at 33.)  At closing, RE/MAX Extreme received a commission in the amount of

16   $17,400 plus a document processing fee of $395.  (Reed Fraud MSJ, Exs. A, N, O; CMSJ,

17   Ex. G, Attach. 8.)  According to FATCO's Final Statement, the commission came out of the

18   seller's funds while the document processing fee came out of the buyer's funds.  (CMSJ,

19   Ex. G, Attach. 8.)

20           Kearney obtained the financing for the purchase of the 801 Property from

21   Defendant Cumorah Credit Union ("Cumorah") in the amount of $315,000.  (CMSJ, Ex. C

22   at 111, 114.)  Both Hong and Kim understood that Kearney would obtain financing to

23   purchase the 801 Property, and Kim saw the FATCO Final Statement showing Cumorah as

24   the lender.  (CMSJ, Ex. A at 64, Ex. B at 34, Ex. E, Ex. G, Attach. 8.)  Kearney recorded his

25   interest in the 801 Property on August 16, 2005.  (CMSJ, Ex. G, Attach. 10.)

26   ///

Cumorah recorded the Deed of Trust on August 15, 2005.  (CMSJ, Ex. G, Attach. 11.)  However, Cumorah recorded the Deed of Trust under the wrong property description and under the APN number 177-19-701-008 (the "701 Property").  (CMSJ, Ex. G, Attach. 11; CMSJ, Ex. K at 107-08.)  Kim owned the 701 Property, which she paid for in cash. (CMSJ, Ex. B at 24.)

Although the Option Agreement directed Plaintiffs to make payments to the lending institution, Plaintiffs paid Kearney monthly payments to cover the Cumorah loan payments until March 2006, at which time Plaintiffs indicated they would exercise the option and purchase the 801 Property.  (Id. at 41-42.)  Although the Option Agreement required the parties to open escrow with FATCO, escrow was not opened.  (Reed Fraud MSJ, Ex. Q at 55.)  According to Plaintiffs, Ed and Kearney advised Plaintiffs that no escrow was necessary and Plaintiffs should issue a check directly to Kearney.[1]  (CMSJ, Ex. B at 43; Salls Decl., Ex. 5 at 59-60.)  According to Kim, Ed told Kim he trusted Kearney completely.  (CMSJ, Ex. B at 47.)  Plaintiffs were "suspicious" of this arrangement, but nevertheless made out a check in the amount of $330,000 to Kearney on March 14, 2006. (CMSJ, Ex. B at 43-44, 46-47; Reed Fraud MSJ, Ex. P.)  However, Kearney did not immediately transfer ownership of the 801 Property to Plaintiffs, nor did he pay off the Cumorah loan with the funds Plaintiffs paid him.  (Pls.' Opp'n to CMSJ (Doc. #177), Ex. 5 at 72-73.)  According to Plaintiffs, they inquired several times when Kearney would transfer title and if the loan on the 801 Property had been paid off, and Ed and Kearney assured them the loan was paid off.  (CMSJ, Ex. B at 51-53.)  Plaintiffs did not contact Cumorah to determine if the loan had been satisfied.  (Id. at 54.)

In June 2006, Kearney transferred title to the 801 Property to Kim and Kim recorded her interest in the 801 Property using the correct APN number and property

---

[1]  Kearney testified he followed Ed's advice not to open escrow.  (Salls Decl., Ex. 4 at 152.)

description on June 27, 2006.  (CMSJ, Ex. G., Attach. 12.)  Kearney made payments on the Cumorah loan for approximately one year thereafter, but ultimately stopped making payments and never fully repaid the loan.  (CMSJ, Ex. C at 144; Pls.' Opp'n to CMSJ, Ex. 5 at 72-73.)  According to Kearney, he stopped making payments on the loan because of another agreement he had with Hong.  (Reed Fraud MSJ, Ex. Q at 73.)  Kearney did not advise either Hong or Kim that he stopped making payments on the loan.  (Id.)

On October 29, 2008, FATCO re-recorded the Cumorah Deed of Trust to add a corrected legal description, but again recorded it under the 701 Property APN.  (CMSJ, Ex. G, Attach. 13.)  On December 15, 2008, Cumorah recorded a Substitution of Trustee substituting Defendant Valley Foreclosure Services ("VFS") for FATCO as Trustee on the Deed of Trust.  (Request for Judicial Notice (Doc. #161), Ex. 5.)  That same date, VFS recorded a Notice of Breach and Election to Sell Under Deed of Trust under the 701 APN.  (CMSJ, Ex. G, Attach. 14.)  VFS sent notice to Kim that Kearney was in default on the loan and that Plaintiffs had thirty-five days to exercise a right of redemption or face foreclosure.  (CMSJ, Ex. G, Attach. 15.)

Cumorah and VFS were aware of the error in the recording of the Deed of Trust and they were aware that Kim had recorded an interest in the 801 Property.  (CMSJ, Ex. J at 100-05, 108, Ex. K at 93 107-08; Pls.' Opp'n to CMSJ, Ex. 7 at 76, 122-23.)  In an email dated February 25, 2009, from VFS to Cumorah, a VFS employee stated that this foreclosure was "going to be a mess I think since [Kearney] sold the property and kept the money.  Oh well, let's proceed and see what happens."  (Pls.' Opp'n to CMSJ, Ex. 6.)  Although Cumora initially advised VFS to hold off on foreclosure, Cumorah subsequently gave VFS approval to continue.  (Id. at 128.)  VFS sent a letter to Kim on March 19, 2009, advising that the 801 Property would be sold on April 23, 2009.  (CMSJ, Ex. G, Attach. 16.)  On March 20, 2009, VFS recorded a Notice of Trustee's Sale on the 801 Property.  (Request for Judicial Notice, Ex. 7.)  The 801 Property was sold to Cumorah, and Cumorah

recorded a Trustee's Deed Upon Sale under the correct APN number for the 801 Property on April 20, 2009.  (CMSJ, Ex. G, Attach. 17.)

    Plaintiffs brought suit in this Court on October 15, 2009 against Kearney, Ed, Barbara, RE/MAX Extreme, FATCO, FATCO employee Gina Thomas, and two law firms which previously had attempted to assist Plaintiffs in relation to their claims to the 801 Property, asserting various claims against Defendants in relation to the purchase transaction and subsequent foreclosure on the 801 Property.  (Compl. (Doc. #1).)  Plaintiffs thereafter amended their Complaint to add as Defendants Cumorah and VFS, as well as another attorney, Charles Damus.  (First Am. Compl..)  Plaintiffs have settled their claims against the original attorney Defendants as well as with FATCO and Gina Thomas.  (Order on Stip. (Doc. #105); Order Granting Stip. of Dismissal (Doc. #123); Order on Stip. (Doc. #125).)

    The Court dismissed several of Plaintiffs' claims against the remaining Defendants.  As to the Reed Defendants, the Court dismissed without prejudice Plaintiffs' contract-based claims for failure to allege facts that any contract existed between Plaintiffs and the Reed Defendants.  (Order (Doc. #85) at 8.)  As to VFS and Cumorah, the Court denied leave to amend the Complaint with prejudice to add a wrongful foreclosure claim as untimely and denied leave to amend the Complaint without prejudice to add a conversion claim for failure to allege the conversion of any personal property.  (Order (Doc. #86) at 7-8, 10.)  The Court also denied leave to amend with prejudice Plaintiffs' proposed quiet title claim against VFS, as VFS disclaimed any interest in the 801 Property.  (Id. at 9.)  The Court indicated that Plaintiffs could elect to stand on the First Amended Complaint or Plaintiffs could file a second amended complaint within thirty days of the date of that Order to cure any deficiencies identified in the Court's orders.  (Id. at 10, 13.)  Plaintiffs did not file a second amended complaint within thirty days.

    The Court later dismissed Defendant Charles Damus and VFS for lack of subject matter jurisdiction.  (Mins. of Proceedings (Doc. #117).)  The Court subsequently reinstated

VFS as a defendant in this action.  (Mins. of Proceedings (Doc. #181).)  Plaintiffs settled

with Kearney and voluntarily dismissed their claims against him.  (Order Approving Notice

of Voluntary Dismissal (Doc. #128).)

Defendant Cumorah now moves for summary judgment on all claims against it

and Defendant VFS joins in that motion.  Plaintiffs move for leave to file a second amended

complaint to add Tobler as a defendant and to correct the party name for Barbie Ltd.

Plaintiffs also move to suspend the dispositive motion deadline, for relief from the

voluntary dismissal of their claims against Kearney, and for clarification of this Court's

Order reinstating VFS as a defendant.  The Reed Defendants filed four separate motions for

partial summary judgment on Plaintiffs' claims against them.  The Court will address these

motions in turn.

## II.  CUMORAH'S MOTION FOR SUMMARY JUDGMENT (Doc. #159) AND VFS'S JOINDER (Doc. #182)

Plaintiffs assert against Defendant Cumorah claims for slander of title (count

thirty-nine) and quiet title (count forty).  Plaintiffs also assert a slander of title claim against

Defendant VFS (count thirty-nine).  Defendant Cumorah now moves for summary

judgment, arguing that because this Court dismissed Plaintiffs' wrongful foreclosure claim

as untimely, Plaintiffs other claims likewise are untimely because they are inextricably

intertwined with the foreclosure under the facts of this case.  Alternatively, Cumorah argues

that Plaintiffs' slander of title claim fails because Cumorah has made no false statements

relating to title, Plaintiffs have no evidence of malice, and Plaintiffs cannot show causation

for any injuries they sustained.  As to the quiet title claim, Cumorah argues Plaintiffs are not

bona fide purchasers without notice because they had actual knowledge of the Cumorah lien

on the property or at least were on inquiry notice.  VFS filed a summary joinder in the

motion.

///

Plaintiffs respond by arguing Defendants have no legal authority for the proposition that slander of title and quiet title claims must be brought within the same time frame as required to challenge a foreclosure under Nevada law.  Plaintiffs contend that the elements of their slander of title and quiet title claims are different than their previously dismissed wrongful foreclosure claim, and thus are not dependent on the wrongful foreclosure claim.  As to the slander of title claim, Plaintiffs argue Cumorah made false statements, through its agent VFS, that it was the rightful owner of the 801 Property with authority to foreclose upon it.  Plaintiffs contend that because they recorded their interest in the 801 Property before Cumorah properly recorded its interest in the 801 Property, Plaintiffs have superior title and Cumorah's recorded filings to the contrary are false. Plaintiffs argue an issue of fact remains as to whether Cumorah acted with malice because Cumorah knew of Plaintiffs' claim to a superior interest in the 801 Property, yet Cumorah proceeded with the foreclosure anyway.  Plaintiffs contend they have suffered damages in the form of attorneys' fees and costs in having to litigate Cumorah's false statements regarding the 801 Property.

As to the quiet title claim, Plaintiffs contend they are bona fide purchasers for value without notice because Cumorah failed to record its interest in the 801 Property properly before Plaintiffs recorded their interest in the 801 Property.  Plaintiffs contend that even if they were on inquiry notice regarding the Cumorah loan, a genuine issue of material fact remains as to whether they engaged in a reasonable investigation where they asked Ed, Kearney, and others multiple times whether the loan had been paid off and they were assured that it had been.  As to VFS, Plaintiffs argue the Court should not consider VFS's summary joinder which makes no argument as to how Cumorah's Motion applies to VFS.

### A.  Quiet Title (count thirty-nine)

Under Nevada law, a plaintiff may bring a quiet title action to determine adverse claims to real property.  Nev. Rev. Stat. § 40.010.  The priority of competing claims to real

property generally is governed by Nevada's recording statute, which provides that a recorded interest in property "impart[s] notice to all persons of the contents thereof; and subsequent purchasers and mortgagees shall be deemed to purchase and take with notice." Nev. Rev. Stat. § 111.320.  However, an unrecorded property interest is "void as against any subsequent purchaser, in good faith and for a valuable consideration" if the subsequent purchaser's interest is "first duly recorded."  Id. § 111.325.  "A subsequent purchaser with notice, actual or constructive, of an interest in the land superior to that which he is purchasing is not a purchaser in good faith, and not entitled to the protection of the recording act."  Allison Steel Mfg. Co. v. Bentonite, Inc., 471 P.2d 666, 669 (Nev. 1970).

The recording statutes provide constructive notice of a competing property right. Id. at 668-69; see also Nev. Rev. Stat. § 247.190(1) (stating that a properly recorded document "provides notice to all persons of the contents thereof, and all third parties shall be deemed to purchase and take with notice").  Additionally, a subsequent purchaser is not a good faith purchaser without notice if he or she was under a duty to inquire.  Berge v. Fredericks, 591 P.2d 246, 249 (Nev. 1979).  A person is under a duty to inquire when he or she possesses facts which would lead a reasonable person under the circumstances to investigate.  Id.  Even if the subsequent purchaser does not actually conduct an investigation, the law deems him or her to have constructive notice of whatever the investigation would uncover.  Id.  However, a subsequent purchaser "may rebut the presumption of notice by showing that he made due investigation without discovering the prior right or title he was bound to investigate."  Id.  Whether the subsequent purchaser conducted an adequate investigation generally is a question for the fact finder.  Id.

To effectuate the priority rules set forth in sections 111.320 and 111.325, Nevada law requires each county recorder to maintain alphabetical grantor and grantee indices. Nev. Rev. Stat. §§ 247.120(1), 247.150(1), (4), (7).  As Nevada has described its system:

///

A prospective purchaser of land may search those indices to ensure that the person attempting to sell the property has clear title to it.  To search the indices, the prospective purchaser would first search the grantee index for the purported owner's name to ascertain when and from whom the purported owner received the property.  Using that name, the purchaser would check the grantee index for the names of each previous owner, thus establishing the "chain of title."  The purchaser must then search the grantor index, starting with the first owner in the chain of title, to see whether he or she transferred or encumbered the property during the time between his or her acquisition of the property and its transfer to the next person in the chain of title.  Whether or not a purchaser of real property performs this search, he or she is charged with constructive notice of, and takes ownership of the property subject to, any interest such a title search would reveal.

Adaven Mgmt., Inc. v. Mountain Falls Acquisition Corp., 191 P.3d 1189, 1195 (Nev. 2008) (footnotes omitted).

Plaintiffs claim superior title to the 801 Property based on their contention that they are subsequent good faith purchasers without notice of Cumorah's interest.  However, no genuine issue of material fact remains that Plaintiffs had actual notice of Cumorah's interest in the 801 Property.  Plaintiffs specifically had arranged with Kearney for Kearney to obtain financing to purchase the 801 Property and Plaintiffs admitted in their depositions that they understood Kearney would obtain financing to facilitate the purchase of the 801 Property.  Plaintiffs also knew from the FATCO Final Statement that Cumorah was the entity which provided that loan.  Plaintiffs made monthly payments to Kearney to cover the monthly loan obligation.  Plaintiffs' actual knowledge is further demonstrated by the fact that they repeatedly questioned whether Kearney had paid off the loan encumbering the 801 Property.

Additionally, no genuine issue of material fact remains that Plaintiffs were on constructive and inquiry notice of Cumorah's interest because a search of the grantor-grantee indices would have revealed Cumorah's recordation of the Deed of Trust.  As the indices are arranged alphabetically by grantor and grantee name, Cumorah's failure to use the correct legal description or APN number would not have prevented Plaintiffs from

finding the Deed of Trust in the chain of title.  Because Plaintiffs knew Kearney was obtaining the 801 Property via financing from Cumorah and because Plaintiff Kim owned the 701 Property for which she paid cash, Plaintiffs would have known that Cumorah's recorded interest related to the 801 Property, not the 701 Property.

Moreover, the Trustee's Deed Upon Sale vested in Cumorah absolute title "without equity or right of redemption."  Nev. Rev. Stat. § 107.080(5).  A court of competent jurisdiction could have voided Cumorah's title if Plaintiffs had commenced an action challenging the foreclosure sale within ninety days after the date of the sale, but Plaintiffs did not do so.  Id. § 107.080(5)(b).  Under Nevada law, a valid trustee's foreclosure sale terminates legal and equitable interests in the property.  Charmicor, Inc. v. Bradshaw Fin. Co., 550 P.2d 413, 415 (Nev. 1976); see also In re Grant, 303 B.R. 205, 208-09 (Bankr. D. Nev. 2003).  Plaintiffs had notice of the sale but did nothing to prevent the sale before the sale took place and failed to act within the ninety-day period for challenging Cumorah's title after the sale.  Plaintiffs' legal and equitable interests in the 801 Property therefore terminated, and Cumorah has superior title to the 801 Property.  Consequently, the Court will grant Cumorah's Motion for Summary Judgment on Plaintiffs' quiet title claim.

## B.  Slander of Title (count forty)

To establish a slander of title claim, the plaintiff must show the defendant made a false and malicious statement which disparaged the plaintiff's title in land causing special damages.  Executive Mgmt., Ltd. v. Ticor Title Ins. Co., 963 P.2d 465, 478 (Nev. 1998).  Recording a false document constitutes making a false statement.  Summa Corp. v. Greenspun, 607 P.2d 569, 573 (Nev. 1980).  A defendant makes a false statement maliciously if the defendant knew the statement was false or the defendant acted in reckless disregard of the statement's truth or falsity.  Rowland v. Lepire, 662 P.2d 1332, 1335 (Nev. 1983).  "Where a defendant has reasonable grounds for belief in his claim, he has not acted with malice."  Id.  Special damages may constitute both impairment of the land's

vendability as well as expenses sustained in removing the cloud on the plaintiff's title caused by the false statement.  Summa Corp. v. Greenspun, 655 P.2d 513, 515 (Nev. 1982).

Assuming Cumorah's recording of the Deed of Trust and other documents under the 701 Property APN were false because Cumorah had no interest in the 701 Property, Plaintiffs do not assert these filings resulted in any special damages in attempting to remove a cloud upon the 701 Property's title.  To the extent these filings put a cloud on the 801 Property, they would not be false because Cumorah had an interest in the 801 Property and, as discussed above, that interest was superior to Plaintiffs' interest.  Furthermore, even if Cumorah maliciously made false statements regarding either property, Plaintiffs have presented no evidence of special damages incurred as a result of their attempt to remove the cloud on title purportedly created by these filings.  Although Plaintiffs state they have incurred attorneys' fees, Plaintiffs present no evidence of any expenses incurred in attempting to cure the cloud on title caused by any false recording nor do they present any evidence supporting damages from impairment of the land's vendability.  The Court therefore will grant Defendant Cumorah's Motion for Summary Judgment on Plaintiffs' slander of title claim.  Because this same reasoning also applies to Defendant VFS, the Court will grant Defendant VFS's Joinder and will grant summary judgment in VFS's favor on Plaintiffs' slander of title claim.

**III.  PLAINTIFFS' MOTION FOR LEAVE TO AMEND (Doc. #163) & PLAINTIFFS' MOTION TO SUSPEND DISPOSITIVE MOTION DEADLINE (Doc. #165)**

Plaintiffs move to amend the First Amended Complaint to add as defendants Tobler and RLT.  Plaintiffs also seek to amend the caption to correct the legal name of Barbie Ltd. doing business as RE/MAX Extreme.  Only Defendant Cumorah files a limited opposition, arguing that the Court first should decide Cumorah's summary judgment motion.  Alternatively, Cumorah argues that if the Court permits amendment and reopens discovery, the Court should not allow Plaintiffs to use any material obtained in such

1   discovery against Cumorah.

2          This Court already has granted summary judgment in favor of Defendant

3   Cumorah.  Consequently, permitting Plaintiffs to amend will not affect Defendant

4   Cumorah, and no other Defendants opposed the motion.  The Court therefore will grant

5   Plaintiffs' Motion to Amend and Plaintiffs' Motion to Extend the Dispositive Motion

6   Deadline subject to the following qualifications.  See Foman v. Davis, 371 U.S. 178, 182

7   (1962); Fed. R. Civ. P. 15(a)(2); LR 7-2(d).  Plaintiffs shall file separately the Second

8   Amended Complaint within fifteen (15) days of the date of this Order.  The Court will

9   direct the Clerk of Court to amend the caption to correct the name of current Defendant

10  Reed Team doing business as RE/MAX Extreme to its proper name, Barbie Ltd. doing

11  business as RE/MAX Extreme.  Defendant Barbie Ltd. need not file an answer to the

12  Second Amended Complaint, as the parties have operated as if Plaintiffs have named the

13  proper entity.

14         The filing of the Second Amended Complaint does not revive any claim against

15  any Defendant which this Court has resolved, either previously or in this Order.  Any party

16  who is a Defendant named in the First Amended Complaint need not file an answer to the

17  Second Amended Complaint.  Moreover, the Court will extend the dispositive motion

18  deadline only with respect to the newly added Defendants in the Second Amended

19  Complaint, and Plaintiffs may not reopen discovery with any Defendant named in the First

20  Amended Complaint, as Plaintiffs have had adequate time to conduct discovery and file a

21  dispositive motion against those Defendants named in the First Amended Complaint.

22  **IV.  REED DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT ON**
**NEGLIGENT UNDERTAKING TO PERFORM SERVICES (Doc. #167)**

23

24         Count twenty of Plaintiffs' First Amended Complaint asserts a claim for

25  negligent undertaking against the Reed Defendants.  The Reed Defendants move for

26  summary judgment, arguing that under Nevada law and the Restatement (Second) Torts

§ 324A, a negligent undertaking claim requires evidence of physical harm.  Alternatively, the Reed Defendants argue this claim is barred by Nevada Revised Statutes § 645.251. Plaintiffs respond that no physical harm is required and Defendants have misinterpreted their claim, which is based on Restatement § 299A, not § 324A.  Plaintiffs also contend § 645.251 does not bar their claim; rather, it sets the standard of care.

Pursuant to the Restatement (Second) of Torts § 324A:

> One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if
>> (a) his failure to exercise such care increases the risk of such harm, or
>> (b) he has undertaken to perform a duty owed by the other to the third person,  or
>> (c) the harm is suffered because of reliance of the other or the third person upon the undertaking.

Under Nevada law, physical harm is required to support a claim under § 324A.  See, e.g., Wright v. Schum, 781 P.2d 1142, 1144 (Nev. 1989).

In contrast, § 299A provides for liability for negligently rendered professional services:

> Unless he represents that he has greater or less skill or knowledge, one who undertakes to render services in the practice of a profession or trade is required to exercise the skill and knowledge normally possessed by members of that profession or trade in good standing in similar communities.

The skill or knowledge at issue "is the result of acquired learning, and aptitude developed by special training and experience.  All professions, and most trades, are necessarily skilled, and the word is used to refer to the special competence which they require."  Restatement (Second) Torts § 299A cmt. a.  Section 299A "applies to any person who undertakes to render services to another in the practice of a profession, such as that of physician or surgeon, dentist, pharmacist, oculist, attorney, accountant, or engineer."  Id. § 299A cmt. b.

///

As between the two sections of the Restatement, Plaintiffs' negligent undertaking claim is based on § 299A, not § 324A.  In the First Amended Complaint, Plaintiffs alleged that the Reed Defendants "undertook to render services as Plaintiffs' fiduciary in the practice of licensed real estate agents."  (First Am. Compl. at ¶ 323.)  Plaintiffs further alleged the Reed Defendants "failed to exercise the skill and knowledge normally possessed by members of that profession or trade in good standing in similar communities."  (Id. at ¶ 324.)  Plaintiffs thus are alleging professional negligence under § 299A.  As a result, Plaintiffs need not show physical harm, as § 324A does not apply.

Nevada has not addressed whether real estate agents are professionals to whom § 299A applies.  "Where the state's highest court has not decided an issue, the task of the federal courts is to predict how the state high court would resolve it."  Giles v. Gen. Motors Acceptance Corp., 494 F.3d 865, 872 (9th Cir. 2007) (quotation omitted).  "In answering that question, this court looks for 'guidance' to decisions by intermediate appellate courts of the state and by courts in other jurisdictions."  Id. (quotation omitted).

At least one other jurisdiction has found real estate agents to be professionals to whom § 299A applies.  See Menzel v. Morse, 362 N.W.2d 465, 471-72 (Iowa 1985).  The Court concludes Nevada likewise would hold a real estate agent is a professional to whom § 299A applies.  In Nevada, it is unlawful to act or hold oneself out as a real estate broker or salesperson without first being licensed by the Nevada Real Estate Division.  Nev. Rev. Stat. § 645.230(1)(a).  To become licensed, a real estate licensee must provide proof that the person has "successfully completed a course of instruction in the principles, practices, procedures, law and ethics of real estate."  Id. § 645.343(1).  Additionally, the licensee must pass an examination and fulfill certain character and fitness requirements.  Id. § 645.330(1).  Consequently, to be a licensed real estate agent in Nevada, a person must obtain specialized education and must demonstrate aptitude in the principles governing the profession.  The Court therefore concludes a real estate licensee is a professional to whom § 299A applies.

Finally, the Court previously has rejected the Reed Defendants' argument that Nevada Revised Statutes § 645.251 bars Plaintiffs' common law claims.  (Order (Doc. #85) at 7.)  The Court therefore will deny the Reed Defendants' Motion for Summary Judgment on Plaintiffs' negligent undertaking claim.

**V.  REED DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT ON CIVIL CONSPIRACY, CONCERT OF ACTION, AIDING AND ABETTING (Doc. #168)**

Plaintiffs assert against the Reed Defendants claims for civil conspiracy (count sixteen), concert of action (count seventeen), and aiding and abetting (count eighteen).  The Reed Defendants move for summary judgment on the concert of action claim, arguing Plaintiffs have no evidence of agreement between the Reed Defendants and Kearney to engage in any inherently dangerous activity.  As to conspiracy, the Reed Defendants argue there is no evidence the Reed Defendants agreed with Kearney to achieve any unlawful objective, there is no evidence the Reeds knew Kearney would not pay off the Cumorah loan, and Plaintiffs cannot show causation because Kearney testified he stopped making payments on the loan due to a separate agreement with Hong rather than an agreement with the Reeds.  Finally, as to the aiding and abetting claim, the Reed Defendants argue there is no evidence the Reed Defendants knew of any role and knowingly supported Kearney in taking Plaintiffs money without paying off the Cumorah loan.

Plaintiffs respond that concert of action claims are not limited to situations where the defendants engage in inherently dangerous activity and Plaintiffs have presented evidence raising a genuine issue of material fact that the Reed Defendants and Kearney had an agreement.  As to conspiracy, Plaintiffs respond that genuine issues of material fact remain regarding an agreement and intent generally is a question of fact that should not be resolved on summary judgment.  As to aiding and abetting, Plaintiffs argue that Ed advised Plaintiffs not to open escrow and Kearney could not have taken Plaintiffs money if escrow had been opened.

### A.  Concert of Action (count seventeen)

To establish a concert of action claim under Nevada law, the plaintiff must show the defendants "agreed to engage in conduct that is inherently dangerous or poses a substantial risk of harm to others."  GES, Inc. v. Corbitt, 21 P.3d 11, 14-15 (Nev. 2001). Engaging in a real estate transaction is not inherently dangerous and does not pose a substantial risk of harm to others.  The Court therefore will grant the Reed Defendants' Motion for Summary Judgment on Plaintiffs' concert of action claim.

### B.  Civil Conspiracy (count sixteen)

Under Nevada law, to establish a claim for civil conspiracy, the plaintiff must show "a combination of two or more persons who, by some concerted action, intend to accomplish some unlawful objective for the purpose of harming another which results in damage."  Collins v. Union Fed. Sav. & Loan Ass'n, 662 P.2d 610, 622 (Nev. 1983).   The agreement may be either explicit or tacit.  GES, Inc., 21 P.3d at 15.  The plaintiff may use circumstantial evidence to prove his case, such as demonstrating that the conspirators "committed acts that are unlikely to have been undertaken without an agreement." Mendocino Envtl. Ctr. v. Mendocino Cnty., 192 F.3d 1283, 1301 (9th Cir. 1999) (quotation omitted).

Plaintiffs have failed to present evidence raising a genuine issue of material fact that the Reed Defendants had an agreement with Kearney to accomplish an unlawful objective for the purpose of harming Plaintiffs.  Plaintiffs contend that genuine issues of fact remain because the Reed Defendants and Kearney had a marketing agreement, Ed contacted Kearney to obtain the financing, Ed orchestrated the deal, Kearney became Ed's client, and Ed told Plaintiffs not to open escrow.  However, the fact that the Reed Defendants and Kearney had a marketing agreement does not show they had an agreement for an unlawful objective.  Plaintiffs identify no unlawful objective to the marketing agreement.

The fact that Ed contacted Kearney to obtain the financing for Plaintiffs also does not raise an issue of fact that the Reed Defendants and Kearney had an agreement with an unlawful objective.  Plaintiffs needed alternative means to finance the property purchase and the Reed Defendants referred Plaintiffs to Kearney as they had done for a substantial portion of their other clients.  Plaintiffs have presented no evidence that the Reed Team and Kearney had made similar arrangements in other cases which harmed any of the Reed Team's clients or that the Reed Defendants made the referral with any unlawful objective.

Likewise, the fact that Ed orchestrated the deal, Kearney became Ed's client, and Ed told Plaintiffs not to open escrow do not demonstrate the Reed Defendants agreed with Kearney to achieve an unlawful objective.  The Reed Defendants deny that they knew or had any reason to suspect Kearney would not fulfill his end of the Option Agreement, and Plaintiffs have presented no evidence to the contrary.  The Court therefore will grant the Reed Defendants' Motion for Summary Judgment on Plaintiffs' civil conspiracy claim.

### C.  Aiding and Abetting (count eighteen)

To establish aiding and abetting in the civil context, a plaintiff must allege: (1) the primary violator breached a duty that injured the plaintiff; (2) the alleged aider and abettor "was aware of its role in promoting [the breach] at the time it provided assistance," and (3) the alleged aider and abetter "knowingly and substantially assisted" the primary violator in committing the breach.  Dow Chem. Co. v. Mahlum, 970 P.2d 98, 112 (Nev. 1998), overruled in part on other grounds by GES, Inc., 21 P.3d at 15.  "The second and third elements should be weighed together, that is, greater evidence supporting the second element requires less evidence of the third element, and vice versa."  Id.

As discussed above, the Reed Defendants deny that they knew or had reason to suspect Kearney would not fulfill his obligations under the Option Agreement and Plaintiffs present no evidence to the contrary.  Consequently, Plaintiffs have not presented any evidence raising a genuine issue of material fact that the Reed Defendants were aware of

their role or that they knowingly and substantially assisted Kearney in taking Plaintiffs' funds without paying off the Cumorah loan.  The Court therefore will grant the Reed Defendants' Motion for Summary Judgment as to the aiding and abetting claim.

**VI.  REED DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT ON CONTRACT RELATED CLAIMS (Doc. #169)**

This Court previously dismissed Plaintiffs' contract-based claims against the Reed Defendants and gave Plaintiffs thirty days to amend.  Plaintiffs did not amend. Therefore, there are no pending contract-based claims against the Reed Defendants. Accordingly, the Court will deny this portion of the Motion as moot.

Count twenty-eight of Plaintiffs' First Amended Complaint alleges the Reed Defendants were unjustly enriched by the receipt of a commission and other fees arising out of the property purchase.  The Reed Defendants move to dismiss this claim, arguing that Plaintiffs did not confer a benefit on the Reed Defendants because the commission was paid out of the sellers' funds as shown by the FATCO Final Statement.  Plaintiffs respond that genuine issues of fact remain because Kearney asked Plaintiffs to provide extra funds to cover the Reed Team's commission and Plaintiffs did so.

Under Nevada law, "[u]njust enrichment occurs whenever a person has and retains a benefit which in equity and good conscience belongs to another."  In re Amerco Derivative Litig., 252 P.3d 681, 703 (Nev. 2011) (quotation omitted).  Genuine issues of material fact remain as to whether Plaintiffs conferred a benefit on the Reed Defendants. Although the FATCO Final Statement shows the commission was to come from the sellers' funds, Kearney testified that he asked Plaintiffs for funds to cover the Reed Defendants' commission.  Plaintiffs wrote a check to Kearney in an amount similar to the Reed Defendants' commission.  Moreover, the FATCO Final Statement shows that the document processing fee was paid out of the buyers' funds.  The Court therefore will deny the Reed Defendants' Motion for Summary Judgment as to Plaintiffs' unjust enrichment claim.

**VII.  REED DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT ON FRAUD-BASED CLAIMS (Doc. #170)**

Plaintiffs assert against the Reed Defendants several claims sounding in fraud or misrepresentation, including federal securities fraud (count one), conspiracy to commit federal securities fraud (count three), Nevada securities fraud (count four), fraudulent misrepresentation (count six), fraud in the inducement (count nine), fraudulent concealment (count eleven), constructive fraud (count thirteen), and negligent misrepresentation (count fourteen).  The Reed Defendants move to dismiss these claims on various grounds.

**A.  Federal Securities Fraud (counts one and three)**

The Reed Defendants argue they are entitled to summary judgment because to state a federal securities fraud claim, the fraud must be in connection with a "security" and there is no evidence of a security.  To the extent the Note is a security, the Reed Defendants deny they participated in any forgery of Hong's signature and argue they had nothing to do with purchasing or selling the Note.

Plaintiffs respond that under federal securities law a note or other evidence of indebtedness counts as a security.  Plaintiffs contend the Note pursuant to which Plaintiffs owed $100,000 to Napoli and ABK LLC therefore constitutes a security.  Plaintiffs contend a genuine issue of material fact remains as to whether the Reed Defendants sold the Note because Ed recommended Plaintiffs borrow the $100,000 from Kearney.  Plaintiffs also argue the Option Agreement is evidence of indebtedness, and Kearney testified that Ed orchestrated the Option Agreement, including determining how much money Kearney would receive.

To establish a federal securities fraud claim, there must be a connection between the misrepresentation or omission and the purchase or sale of a security.  Dura Pharm., Inc. v. Broudo, 544 U.S. 336, 341 (2005).  A "security" includes "any note . . . [or] evidence of indebtedness . . . ."  15 U.S.C. § 77b(a)(1).  Although the statute's literal terms appear to

cover any note or evidence of indebtedness, the courts have rejected a literal interpretation of the statute and instead evaluate the economic realities of the transaction in light of Congressional intent to determine if a security is involved.  Koch v. Hankins, 928 F.2d 1471, 1475 (9th Cir. 1991).  A note presumptively is a security.  Reves v. Ernst & Young, 494 U.S. 56, 67 (1990).  This presumption may be rebutted "only by a showing that the note bears a strong resemblance" to a judicially-created list of instruments that do not qualify as securities.  Id.; S.E.C. v. Wallenbrock, 313 F.3d 532, 536 n.3 (9th Cir. 2002) (listing instruments that are not securities, including a note secured by a mortgage on a home, a short term note secured by a lien on a business's assets, and a character loan to a bank's customer).  To determine whether this strong resemblance exists, courts consider four factors:  (1) "the motivations that would prompt a reasonable seller and buyer to enter into" the transaction; (2) the instrument's "plan of distribution . . .to determine whether it is an instrument in which there is common trading for speculation or investment;" (3) the public's reasonable expectations; and (4) "whether some factor such as the existence of another regulatory scheme significantly reduces the risk of the instrument, thereby rendering application of the Securities Acts unnecessary."  Reves, 494 U.S. at 66-67 (quotation omitted).

Here, the first factor weighs against finding the Note is a security.  The purpose of the Note was to provide Plaintiffs a short term loan to cover the cash needed at closing. The purpose was not to "raise money for the general use of a business enterprise or to finance substantial investments."  Reves, 494 U.S. at 66.  Rather, the Note was "to correct for [Plaintiffs'] cash-flow difficulties," and the Note therefore is  "less sensibly described as a 'security.'"  Id.  The second factor also weighs against finding the Note is a security.  The Note was not "offered and sold to a broad segment of the public."  Wallenbrock, 313 F.3d at 539 (quotation omitted).  The third factor also weighs against the Note being considered a security because the investing public's reasonable expectations would be that this was a

short term loan, not an investment.  The final factor weighs in favor of finding the Note a security because no other regulatory scheme significantly reduced the risk of the instrument beyond resort to normal collection processes.  Weighing the four factors, the Court concludes the Note is not a security within the meaning of  § 77b(a)(1).  The Note bears a family resemblance to those categories of notes judicially deemed not to be securities.  This was a one-time, short term loan between a single borrower and two lenders for the purpose of covering a shortfall of cash in relation to a single transaction.

The Court likewise concludes the Option Agreement is not a security in the form of "evidence of indebtedness."  Here, the economic realities of the transaction demonstrate this was a one-time option contract on real property between two individuals for the purpose of facilitating a single real property purchase where one party could not obtain conventional financing within the necessary time frame.  The Option Agreement is not a commercial instrument which in and of itself has value to the holder as evidence of indebtedness.  There is no evidence it was designed, contemplated, or treated as being a publicly traded instrument.  Because no security is involved, the Court will grant the Reed Defendants' Motion for Summary Judgment on the federal securities fraud claims.

### B. Nevada Securities Fraud (count four)

Count four of Plaintiffs' First Amended Complaint alleges the Reed Defendants violated Nevada law by offering, selling, or purchasing the Note without a a securities broker-dealer license.  The Reed Defendants argue they are not liable on this claim because they did not issue the Note or act as a broker-dealer on the Note.  Plaintiffs respond that a genuine issue of material fact remains as to whether the Reed Defendants brokered the Note because Ed orchestrated the Option Agreement and recommended Plaintiffs obtain the $100,000 from Kearney.

Nevada law makes it unlawful to act as a securities broker-dealer or sales representative unless properly licensed in the State.  Nev. Rev. Stat. § 90.310(1).  A broker-

dealer is "any person engaged in the business of effecting transactions in securities for the account of others or for the person's own account." Id. § 90.220.  A sales representative is "a natural person other than a broker-dealer, authorized to act and acting for a broker-dealer or issuer effecting or attempting to effect purchases or sales of securities." Id. § 90.285.

Nevada follows the Reves "family resemblance" test set forth above. State v. Friend, 40 P.3d 436, 439-40 (Nev. 2002).  Because neither the Note nor the Option Agreement are securities, the Reed Defendants did not act as securities broker-dealers or sales representatives.  Thus the Reed Defendants did not violate § 90.310(1).  Moreover, no genuine issue of material fact remains that the Reed Defendants did not act as broker-dealers or salespersons for the Note.  Plaintiffs only evidence on the point is that the Reed Defendants recommended Plaintiffs obtain a $100,000 loan from Kearney.  Merely recommending a source of financing does not amount to effecting a transaction in a security.  The Court therefore will grant the Reed Defendants' Motion for Summary Judgment on the Nevada securities fraud claim.

### C.  Misrepresentation (counts six and fourteen)

The Reed Defendants move for summary judgment on the fraud-based claims, arguing the statements upon which Plaintiffs base their claims were either non-actionable promises of future performance or Plaintiffs have no evidence that the statement was false when it was made.  Barbara argues there is no evidence she made any representations to Plaintiffs.

Plaintiffs respond that genuine issues of material fact remain as to various misrepresentations the Reed Defendants allegedly made, which Plaintiffs refer to as the "Agency Misrepresentation," the "Value Misrepresentation," the "Timing Misrepresentation," and the "Escrow Misrepresentation."  Plaintiffs also contend the Reed Defendants made other miscellaneous misrepresentations, such as that Kearney was trustworthy, that the transaction would work out, and that when Kearney purchased the

property there was a cash shortage and Plaintiffs needed to pay additional money.

The elements of a cause of action for common law fraud under Nevada law are: (1) the defendant made a false representation; (2) the defendant knew or believed the representation was false or the defendant had an insufficient basis for making the representation; (3) the defendant intended to induce the plaintiff to act or refrain from acting in reliance upon the misrepresentation; (4) the plaintiff justifiably relied on the misrepresentation; and (5) damage to the plaintiff resulted from such reliance. Bulbman, Inc. v. Nevada Bell, 825 P.2d 588, 592 (Nev. 1992). The plaintiff bears the burden of proving each of these elements by clear and convincing evidence. Id. "The mere failure to fulfill a promise or perform in the future . . . will not give rise to a fraud claim absent evidence that the promisor had no intention to perform at the time the promise was made." Id.

### 1. Defendant Barbara Reed

Barbara moves for summary judgment on the two misrepresentation claims arguing she made no representations to Plaintiffs at all, and therefore cannot be liable. Plaintiffs respond that Barbara may be liable even though she did not make an express representation because she was Plaintiffs' agent, she was aware or should have been aware of the transactions relating to the 801 Property, and she failed to inform Plaintiffs of relevant facts.

A defendant may be liable for false statements based on express statements as well as on a "representation which is misleading because it partially suppresses or conceals information." Blanchard v. Blanchard, 839 P.2d 1320, 1322 (Nev. 1992) (quotation and emphasis omitted). However, Plaintiffs have presented no evidence raising a genuine issue of material fact that Barbara made any representation whatsoever to Plaintiffs, much less a misleadingly incomplete representation. Plaintiffs also fail to present evidence raising a genuine issue of material fact that Barbara knew or should have known any fact which

Plaintiffs contend she should have disclosed.  The Court therefore will grant summary

judgment in favor of Barbara on Plaintiffs' misrepresentation claims.

### 2.  Defendant Ed Reed

#### a.  The Agency Misrepresentation

The Agency Misrepresentation consists of Ed's representations to Plaintiffs that

they could place trust and confidence in Ed.  Defendants move for summary judgment,

arguing that Ed's statements were non-actionable promises of future performance and there

is no evidence the statements were false at the time Ed made them.  Plaintiffs respond that a

genuine issue of material fact remains because Kim believes that at the time Ed directed

Plaintiffs to provide the money directly to Kearney the Reed Defendants were not working

in Plaintiffs' interests; Ed orchestrated the transaction; Kearney became Ed's client with

respect to the transaction; and Kearney and the Reed Team had contractual arrangements.

The Agency Misrepresentation is a promise of future performance that is not

actionable unless made without intent to perform.  Plaintiffs fail to present evidence raising

a genuine issue of material fact that at the time Ed made the Agency Misrepresentation, he

had no intent to perform.  Kim's unsupported belief that Ed was not acting in her interests

does not raise an issue of fact.  As for the arrangements between the Reed Team and

Kearney and Ed's advice to pay Kearney directly, Plaintiffs have presented no evidence that

Ed had any reason to suspect Kearney would not fulfill his obligations under the Option

Agreement, nor do Plaintiffs present any other evidence suggesting Ed did not intend to

perform when he made the representations.  The Court will grant the Reed Defendants'

Motion for Summary Judgment as to Plaintiffs' negligent and intentional misrepresentation

claims to the extent they rely upon the Agency Misrepresentation.

#### b.  The Value Misrepresentation

The Value Misrepresentation consists of Ed's representations to Plaintiffs that the

801 Property was worth at least $800,000.  The Reed Defendants move for summary

judgment, arguing that an opinion on value is not actionable, and, in any event, there is no

evidence that the property was not worth $800,000 at the time Ed made the statement.

Plaintiffs respond that the opinion should be rejected because it was nearly twice the actual

purchase price and Plaintiffs have presented an appraisal showing the property was worth

$190,000 in 2009.

Plaintiffs have failed to present evidence raising a genuine issue of material fact

with respect to the Value Misrepresentation. Generally, Nevada law will not permit a claim

of fraud based on a representation of value because it is an opinion or estimate about which

reasonable persons could disagree. Clark Sanitation, Inc. v. Sun Valley Disposal Co., 487

P.2d 337, 339 (Nev. 1971). Moreover, Plaintiffs have presented no evidence that the 801

Property was not worth $800,000 at the time Plaintiffs purchased the property. Plaintiffs'

2009 appraisal sheds no light on the 801 Property's value when Plaintiffs entered into the

Purchase Agreement in 2005. The Court will grant the Reed Defendants' Motion for

Summary Judgment as to Plaintiffs' negligent and intentional misrepresentation claims to

the extent they rely upon the Value Misrepresentation.

c. The Timing Misrepresentation

The Timing Misrepresentation consists of Ed's statements to Plaintiffs that

Plaintiffs would lose a valuable opportunity if Plaintiffs did not purchase the 801 Property.

The Reed Defendants argue Plaintiffs have presented no evidence that this representation

was false. Plaintiffs do not respond other than to state that Plaintiffs entered into the

Purchase Agreement based on the alleged representation. Plaintiffs present no evidence or

argument as to why this representation was false. The Court will grant the Reed

Defendants' Motion for Summary Judgment as to Plaintiffs' negligent and intentional

misrepresentation claims to the extent they rely upon the Timing Misrepresentation.

///

///

d. The Conventional Financing Misrepresentation

The Conventional Financing Misrepresentation consists of Ed's assurances that Plaintiffs would be able to obtain conventional financing. The Reed Defendants argue this was a promise of future action and there is no evidence Ed knew or believed it was false at the time he made the statement, or that he had insufficient basis for making the statement. Plaintiffs respond by stating that Ed guaranteed Plaintiffs would obtain conventional financing and that Plaintiffs would not have entered into the Purchase Agreement had they not relied on Ed's statement. However, Plaintiffs present no evidence raising a genuine issue of material fact that Ed knew or believed Plaintiffs could not obtain conventional financing at the time he made the statement. Nor do Plaintiffs present evidence that Ed had an insufficient basis for making the statement. Plaintiffs had hired Ed previously and the record contains no indication Plaintiffs previously had any trouble obtaining financing in other transactions. Moreover, Plaintiffs had been pre-approved for a loan and it was rejected only upon review by the underwriter due to zoning problems. The Court will grant the Reed Defendants' Motion for Summary Judgment as to Plaintiffs' negligent and intentional misrepresentation claims to the extent they rely upon the Conventional Financing Misrepresentation.

e. Other Misrepresentations

Plaintiff alleged other misrepresentations in counts six and fourteen of the First Amended Complaint, including the Escrow, Clear Title, and Transfer Misrepresentations. (First Am. Compl. at ¶¶ 99, 133, 152, 227, 252, 295.) The Reed Defendants did not move for summary judgment with respect to any of these alleged misrepresentations. Fed. R. Civ. P. 56(a), (c); LR 7-2(d). Plaintiffs' sixth and fourteenth claims therefore remain viable with respect to these alleged misrepresentations.

///

///

**D.  Fraud in the Inducement (count nine)**

The Reed Defendants argue this claim is based on the Value and Agency Misrepresentations, and this claim therefore fails for the same reasons as in count six. Plaintiffs respond by arguing that because genuine issues of fact remain with respect to the Value and Agency Misrepresentations, genuine issues of fact remain with respect to the fraud in the inducement claim.  However, as discussed above, no genuine issue of material fact remains as to the Value and Agency Misrepresentations.  The Court therefore will grant the Reed Defendants' Motion for Summary Judgment as to the fraud in the inducement claim.

**E.  Fraudulent Concealment (count eleven)**

The Reed Defendants argue this claim fails because they had a duty to disclose only what they knew or should have known, and there is no evidence they knew or should have known that Kearney would take Plaintiffs' money without paying off the Cumorah loan.  Plaintiffs respond that genuine issues of material fact remain as to what the Reed Defendants should have known because the Reed Defendants were in communication with Kearney, Ed acted as Kearney's agent, Ed structured the transaction, and Ed communicated with Plaintiffs regarding the 801 Property's status.

Nevada generally does not recognize an action for fraud based on nondisclosure. See Epperson v. Roloff, 719 P.2d 799, 803-04 (Nev. 1986) (noting the "general rule" that "an action in deceit will not lie for nondisclosure").  However, a duty to disclose may arise from the parties' relationship.  Dow Chem. Co, 970 P.2d at 110 ("The duty to disclose requires, at a minimum, some form of relationship between the parties.").  For example, where the parties are involved in a transaction and the defendant knows material facts which are not accessible to the plaintiff, the defendant has a duty of disclosure.  Id.; see also Nelson v. Heer, 163 P.3d 420, 426 (Nev. 2007) ("The suppression or omission of a material fact which a party is bound in good faith to disclose is equivalent to a false representation,

since it constitutes an indirect representation that such fact does not exist." (quotations omitted)).  Additionally, a "special relationship" between the parties may trigger the duty to disclose, even where the plaintiff has access to facts suggesting a problem exists. Mackintosh v. Jack Matthews & Co., 855 P.2d 549, 553 (Nev. 1993).  The duty to disclose may arise "in any situation where one party imposes confidence in the other because of that person's position, and the other party knows of this confidence."  Id. (quotation omitted).

A real estate agent/vendor buyer relationship is one such special relationship triggering a duty to disclose where the agent has superior knowledge.  Nev. Power Co. v. Monsanto Co., 891 F. Supp. 1406, 1416 n.3 (D. Nev. 1995).  Pursuant to Nevada Revised Statutes § 645.252(1)(a), a real estate licensee who acts as an agent in a real estate transaction must disclose to each party to the transaction "[a]ny material and relevant facts, data or information which the licensee knows, or which by the exercise of reasonable care and diligence should have known, relating to the property which is the subject of the transaction."

Count eleven of the First Amended Complaint alleges that the Reed Defendants concealed facts which they knew or should have known in making the Escrow and Transfer Misrepresentations.  (First Am. Compl. at ¶ 280.)  The Escrow Misrepresentation consists of the Reed Defendants advising Plaintiffs that escrow was unnecessary and costly when escrow was necessary to protect Plaintiffs' interests.  The Transfer Misrepresentation consists of the Reed Defendants' statements to Plaintiffs that the 801 Property had been transferred free and clear of the Cumorah lien when it had not been.

The Court will grant the Reed Defendants' Motion for Summary Judgment on this claim as it relates to the Escrow Misrepresentation.  Plaintiffs have presented no evidence raising a genuine issue of material fact that the Reed Defendants knew or should have known that escrow was necessary to ensure that Kearney would pay off the Cumorah loan.

The Court also will grant the Reed Defendants' Motion for Summary Judgment on this claim as it relates to the Transfer Misrepresentation.  Plaintiffs argue that because the Reed Defendants had regular communication with Kearney they knew or should have known that Kearney did not transfer clear title to Plaintiffs.  However, Plaintiffs point to no evidence regarding the substance of these conversations which suggest that the Reed Defendants knew or should have known about Kearney's failure to perform and the Reeds deny they knew Kearney did not transfer clear title until Plaintiffs told them.  Plaintiffs also argue that Ed became Kearney's agent and Ed orchestrated the Option Agreement.  However, Plaintiffs do not explain how either of these facts raises an issue of material fact as to whether the Reed Defendants knew or should have known that Kearney failed to transfer clear title to Plaintiffs.  The Court therefore will grant the Reed Defendants' Motion for Summary Judgment as to the fraudulent concealment claim as it relates to the Transfer Misrepresentation.

## F. Constructive Fraud (count thirteen)

Although the Reed Defendants mention constructive fraud as one of the fraud-based claims for which they move for summary judgment, the Reed Defendants make no argument as to why they are entitled to summary judgment on this claim.  The Court therefore will deny the Motion as to the constructive fraud claim.  Fed. R. Civ. P. 56(a), (c); LR 7-2(d).

## VIII.  PLAINTIFFS' MOTION FOR RELIEF FROM VOLUNTARY DISMISSAL OF ADAM B. KEARNEY (Doc. #179)

Plaintiffs entered into a settlement agreement with Kearney in January 2011. (Pls.' Mot. for Relief from Voluntary Dismissal of Adam B. Kearney (Doc. #179) ["Pls.' Relief Mot."], Ex. 1.)  Based on the settlement agreement, Plaintiffs voluntarily dismissed with prejudice their claims against Kearney.  (Notice of Voluntary Dismissal (Doc. #127).)  Pursuant to the voluntary dismissal, the Court retained jurisdiction over the matter for the

purpose of enforcing the settlement agreement.  (Notice of Voluntary Dismissal (Doc. #128).)  Kearney thereafter failed to make payments due under the settlement agreement. (Pls.' Relief Mot., Ex. 1.)  Plaintiffs made efforts to secure Kearney's performance but he has failed to comply.  (Id.)

Kearney has not opposed the present motion and therefore consents to the motion being granted.  LR 7-2(d).  Moreover, this Court retained jurisdiction over the matter for purposes of enforcing the settlement agreement.  The Court therefore will grant the Motion to the extent Plaintiffs seek to enforce the settlement agreement.  Plaintiffs shall file a motion to enforce the settlement agreement within thirty (30) days from the date of this Order.

**IX. CONCLUSION**

IT IS THEREFORE ORDERED that Defendant Cumorah Credit Union's ("Cumorah") Motion for Summary Judgment (Doc. #159) is hereby GRANTED.  Judgment is hereby entered in favor of Defendant Cumorah Credit Union and against Plaintiffs Tai-Si Kim and Jin-Sung Hong.

IT IS FURTHER ORDERED that Defendant Valley Foreclosure Services' Joinder in Cumorah Credit Union's Motion for Summary Judgment (Doc. #182) is hereby GRANTED.  Judgment is hereby entered in favor of Defendant Valley Foreclosure Services and against Plaintiffs Tai-Si Kim and Jin-Sung Hong.

IT IS FURTHER ORDERED that Plaintiffs' Motion to Extend the Amend Pleading Deadline and Leave to File a Second Amended Complaint (Doc. #163) is hereby GRANTED.

IT IS FURTHER ORDERED that Plaintiffs shall file separately the Second Amended Complaint within fifteen (15) days of the date of this Order.

IT IS FURTHER ORDERED that the Clerk of Court shall amend the caption to correct the name of current Defendant Reed Team doing business as RE/MAX Extreme to

its proper name, Barbie Ltd. doing business as RE/MAX Extreme.

IT IS FURTHER ORDERED that any Defendant named in the First Amended Complaint need not file an answer to the Second Amended Complaint.

IT IS FURTHER ORDERED that Plaintiffs' Emergency Motion to Suspend Dispositive Motion Deadline (Doc. #165) is hereby GRANTED only with respect to any newly named Defendant in the Second Amended Complaint.

IT IS FURTHER ORDERED that Defendants RE/MAX Extreme, Edward C. Reed, and Barbara P. Reed's Motion for Partial Summary Judgment on Negligent Undertaking to Perform Services (Doc. #167) is hereby DENIED.

IT IS FURTHER ORDERED that Defendants RE/MAX Extreme, Edward C. Reed, and Barbara P. Reed's Motion for Partial Summary Judgment on Civil Conspiracy, Concert of Action, Aiding and Abetting (Doc. #168) is hereby GRANTED.

IT IS FURTHER ORDERED that Defendants RE/MAX Extreme, Edward C. Reed, and Barbara P. Reed's Motion for Partial Summary Judgment on Contract Related Claims (Doc. #169) is hereby DENIED.

IT IS FURTHER ORDERED that Defendants RE/MAX Extreme, Edward C. Reed, and Barbara P. Reed's Motion for Partial Summary Judgment on Plaintiffs' Fraud-Based Claims (Doc. #170) is hereby GRANTED in part and DENIED in part.  The Motion is granted as to Plaintiffs' claims for federal securities fraud in counts one and three, Nevada securities fraud in count four, and fraud in the inducement in count nine.  The Motion also is granted as to Plaintiffs' misrepresentation claims in counts six and fourteen with respect to Defendant Barbara Reed, and with respect to Defendants Ed Reed and Barbie Ltd. to the extent the claims are based on the Agency, Value, Timing, and Conventional Financing Misrepresentations.  The Motion also is granted as to Plaintiffs' fraudulent concealment claim in count eleven to the extent the claim is based on the Escrow Misrepresentation.  The Motion is denied in all other respects.

1      IT IS FURTHER ORDERED that Plaintiffs' Motion for Relief From Voluntary

2 Dismissal of Adam B. Kearney (Doc. #179) is hereby GRANTED to the extent Plaintiffs

3 seek to enforce the settlement agreement.  Plaintiffs shall file a motion to enforce the

4 settlement agreement within thirty (30) days from the date of this Order.

5      IT IS FURTHER ORDERED that Plaintiffs' Motion for Clarification of Order

6 (Doc. #197) is hereby DENIED as moot in light of the Magistrate Judge's decision to

7 reopen discovery as to Defendant Valley Foreclosure Services.  (Mins. of Proceedings

8 (Doc. #212).)

10 DATED:  January 22, 2012

                                  PHILIP M. PRO
                                  United States District Judge